IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

JAMES NEVILLE,                        )
                                      )
            Plaintiff,                )
                                      )
     v.                               )       CIVIL ACTION NO. 1:10CV500-SRW
                                      )                  (WO)
MICHAEL J. ASTRUE, Commissioner       )
of Social Security,                   )
                                      )
            Defendant.                )

## MEMORANDUM OF OPINION

Plaintiff James Neville brings this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits and supplemental security income under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

## BACKGROUND

Plaintiff was born on February 16, 1970. (R. 98). He completed twelfth grade in 1990 in special education classes. (R. 147; see also R. 183 and Exhibits 11E and 12E, school records). He has past work as a painter's helper, which was unskilled work performed at the very heavy exertional level. (R. 46-47, 135- 36, 144-45). On February 26, 2007, plaintiff

filed applications for a period of disability and disability insurance benefits and for

supplemental security income, alleging that he became disabled on January 15, 2007, due to

ADHD, depression, a sleeping disorder and arthritis in his knees.  (R. 95-101, 143).  Plaintiff

reported that he had received inpatient treatment at Greil Memorial Psychiatric Hospital from

January 24, 2007, through February 1, 2007, for depression and anger problems. (R. 146-

47).[1]  On March 7, 2007, plaintiff told the DDS disability claims examiner that he had an

appointment scheduled for March 16, 2007, to see a doctor at a mental health clinic in

---

[1] See Exhibit 2F, R. 226-48.  Plaintiff was committed to Greil on the order of Elmore County Judge
Jimmy Stubbs. (R. 232). The initial contact sheet provided to the Greil psychiatrist and clinical director, Dr.
Clemmie Palmer, indicated that plaintiff was in protective custody at the Elmore county jail; was paranoid,
depressed, and had a violent temper; had threatened to kill family members; was hearing voices and talking
to himself; and had, on occasion, become unconscious. (R. 232). On evaluation by Dr. Palmer, plaintiff
admitted talking to himself and to hearing "voices" in the summer of 2006, but he denied current
hallucinations or threatening to kill family members. Plaintiff had not yet filed the present applications but
he told Dr. Palmer that he was "trying to get disability." He stated that he "cannot stay focused at work" and
had a "nervous break down" the previous Friday. He reported some crying episodes; feeling angry, irritable
and stressed; and being unable to sleep well, getting only four to five hours of fragmented sleep a night. (R.
232). Plaintiff said that he was not "on Social Security" but "is applying for Social Security." Dr. Palmer
noted no abnormalities in the mental status examination, other than that plaintiff described his mood as
"confused but all right," and the examiner observed that plaintiff "did lose train of thought on a couple of
occasions." Dr. Palmer noted that the "[]p]sychosis manifested by paranoid and auditory hallucinations" was
"per record. (Id.). Dr. Palmer indicated a provisional diagnostic impression of "Major Depressive Disorder
with Psychosis" and a "rule out" impression of "Schizoaffective Disorder." He prescribed Lexapro (to be
taken in the morning), Seroquel (to be taken at night) and Trazodone (to be taken at night as needed, "if
patient is agitated and will not respond to verbal intervention"). (R. 234). Although plaintiff stated that he
had been prescribed Zoloft two years previously, he denied previous psychiatric treatment or hospitalization.
(R. 232). During his admission, plaintiff "took his medications willingly without medication side effects,"
was "never placed in seclusion or restraints," and attended "groups and classes."  (R. 230). At a staffing
meeting held on January 30, 2007, he was "a little bit preoccupied with receiving disability." Because he
reported a "long history of confusion, learning disability, and ADHD symptoms," his treatment team ordered
an MRI, which yielded normal results. Plaintiff was determined not to be a threat to himself or others, and
was discharged on February 1, 2007, with prescriptions for Lexapro, Singulair, Seroquel and Strattera, and
with a follow-up appointment scheduled for March 16, 2007, at the mental health clinic in Wetumpka.His
discharge diagnoses were "Major Depressive Disorder with Psychosis (Psychosis Resolved)," "Cognitive
Disorder, Not Otherwise Specified," and "Status post left knee surgery." (R. 229-31).

Wetumpka, and that this would be his first visit since his discharge from Greil.[2]  He also told her that he had surgery on his left knee for a "torn cartilage" in 2003 or 2004, that there had been no further follow-up on this problem and that his "knee does not affect his ability to work or perform [activities of daily living]."[3]  Finally, he told the disability examiner that his "sleep problems" were caused by depression and that with his "sleep/depression meds he is able to sleep 12 hours per night." (R. 150).[4]

The Disability Determination Services sent plaintiff to Dr. Warren Brantley, Ph.D., for a consultative psychological examination and IQ testing on April 17, 2007.  Dr. Brantley

---

[2] See Exhibit 10F, R. 293-98. On March 16, 2007, plaintiff presented to the Montgomery Area Mental Health Authority office in Wetumpka for intake evaluation.  Plaintiff met with mental health therapist Lynn Hall on that date, but there is no indication that Hall's assessment was approved by a psychologist or psychiatrist, no treatment note from a psychiatrist at MAMHA, and no indication in the record that plaintiff participated in individual therapy or medication management through MAMHA. (Id.). On April 16, 2007, plaintiff asked his new primary care physician, Dr. Byrd, to take over his psychiatric medications. Dr. Byrd declined, advising plaintiff to follow up with behavioral medicine. (R. 329). On June 19, 2007, plaintiff told Dr. Byrd that he was out of Lexapro and "would like to switch to Zoloft," which he had taken in the past. Dr. Byrd prescribed Zoloft but again declined to manage plaintiff's psychiatric medications.  Dr. Byrd wrote, "He is to call around and find a new psych doctor that will take medicaid – he got tired of Dr. Shah and driving to Wetumpka." (R. 321).

[3] See Exhibit 1F, R. 215-25 (treatment notes for plaintiff's evaluation by orthopedic surgeon Stephen Samelson on August 16, 2004, with a diagnosis of "left knee medial meniscus tear," an MRI performed on August 17, 2004, confirming the diagnosis, and outpatient arthroscopic "right partial medial meniscectomy" performed by Dr. Samelson on August 30, 2004); R. 219 (Dr. Samelson's finding, on examination, that plaintiff's "neck, back, bilateral upper extremities and lower extremities are within normal limits except for his left knee").  During a physical examination performed upon plaintiff's admission to Greil, plaintiff told the examining physician about the arthroscopic surgery on his left knee, but he reported no chief medical complaints. (R. 235). On review of systems, plaintiff identified no "Jt. Pains/Backaches" (R. 238) and no physical problems other than shortness of breath (R. 237-40). On physical examination, the physician noted no abnormalities except as to plaintiff's teeth. (R. 240-45; see R. 241)(noting "Poor Dentition"). The physician diagnosed: (1) "S/P [Left] Knee Surgery" and (2) "SOB [Shortness of Breath]/Smoker." (R. 246).

[4] Plaintiff's mother also told the disability examiner that plaintiff had difficulty sleeping in the past but that this problem resolved with Seroquel, and plaintiff "now sleeps 12 hours uninterrupted." (R. 169). She also stated that plaintiff was "admitted to Greil when he physically assaulted his 10 year old son." (Id.).

dianosed: (1) schizoaffective disorder, bipolar type, with mild manic features but no psychotic features, partially controlled on medication; and (2) borderline intellectual functioning. Dr. Brantley concluded that he is "partially stable, and it should improve as long as he takes his medications." (Exhibit 4F, R. 251-54).[5]

Plaintiff reported to Dr. James Colley on April 23, 2007, for a consultative physical examination.  Plaintiff complained of ADHD, "mental problems," pain in both knees (left greater than right), low back pain, and "easy fatigability." (R. 256-57).  Dr. Colley diagnosed mild osteoarthritis of the left knee, status post arthroscopic surgery, and "[m]yofacial low back pain versus mild degenerative disk disease." (R. 261).  Dr. Colley noted that plaintiff's reported "history of being able to walk for less than a block was inconsistent with his physical examination, both the left knee and with examination of the dorsolumbar spine. The right knee examination was normal." (R. 260).

A non-examining agency psychiatrist, Dr. Robert Estock, completed a Psychiatric Review Technique Form on May 2, 2007, concluding that plaintiff did not meet the criteria of Listings 12.02, 12.03 or 12.04. Dr. Estock further concluded that plaintiff had a mild degree of restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and one or two episodes of decompensation of extended duration. (Exhibit 6F, R. 262-75).  Dr.

---

[5]  Plaintiff indicated, during the evaluation, that his judgment and insight were "improved" on medication, that his thought processing – noted by Dr. Brantley to be atypical, with slightly racing thoughts, circumstantial answers and loose associations – had "improved somewhat," and that his medication "help[ed] him to stay 'mentally calm.'" (R. 252, 254).

Estock also completed a Mental Residual Functional Capacity Assessment, assessing no more than moderate limitations as to any of the listed work-related functions. (Exhibit 8F, R. 284-87). Dr. Estock concluded that plaintiff is able to maintain attention sufficiently to complete simple one to two-step tasks for periods of up to two hours without special supervision or extra rest periods, and to understand, remember and carry out short, simple instructions. He further concluded that, while plaintiff may have moderate difficulty handling more detailed instructions, he "likely can handle even these if they are broken down into simple 1-2 step tasks and he is given adequate rehearsal." (R. 286).[6]

On May 3, 2007, plaintiff's claims were denied. (R. 51-64). He requested a hearing before an administrative law judge. (R. 66).[7] The ALJ conducted the hearing on April 17, 2009. (R. 31-50). At the hearing, plaintiff testified as follows: He has pain in his left knee, back and neck. His left knee was hurting then "a little bit," but "[n]ot too bad," because he had taken pain medicine. For pain, he takes Ibuprofen or Aleve. (R. 38-39). He takes Zoloft.

---

[6] On April 16, 2007, the day before his consultative psychological evaluation with Dr. Brantley, plaintiff began seeing Dr. James Byrd. On that day, he sought treatment for a sinus infection. (R. 305, 310-12,327-31). He returned to Dr. Byrd eight days later, on April 24th, complaining of nausea and vomiting. Dr. Byrd prescribed Phenergan for the nausea and Crestor for plaintiff's hyperlipidemia. (R. 325-26). Plaintiff sought treatment for ear pain on June 19, 2007, for hyperlipidemia and insomnia on July 16, 2007 (for which Dr. Byrd prescribed Crestor and Seroquel, respectively), and for lightheadness and "not feeling well" on July 26, 2007 (but with no objective physical findings). (R. 315-23). On each of these visits, plaintiff denied joint or back pain, and had no abnormalities identified on musculoskeletal examination. (R. 315-29). Dr. Byrd's office faxed a Crestor prescription to the pharmacy for plaintiff on September 20, 2007 (R. 313), but there are no treatment notes for any office visit after July 2007. (Exhibit 11F).

[7] In the interim, on January 28, 2008, plaintiff sought treatment at the Baptist South Emergency Department with a complaint of congestion, hoarseness, and severe abdominal cramps with cough, resulting in near-syncope. The ER physician's clinical impressions were pyrexia, acute bronchitis, hypotension, and near syncope. Plaintiff was discharged to home, in stable condition, with prescriptions for medications. (Exhibit 13F, R. 339-53).

He also takes Bilance for his ADD, and "it calms [him] from getting all-hyper and angry" and helps him to relax.  He takes Seroquel to sleep, and he "sleep[s] pretty good." (R. 38). He started attending special education classes in fifth grade. He has depression and gets aggravated. He is not able to concentrate unless it is quiet, and is easily distracted. He has memory problems.  He does not like to be in a public environment and experiences paranoia. (R. 41-42).  He gets nervous being around people.  He has problems with anger and loses his temper easily. He has headaches. In 2008, he was arrested and – according to what his parents have told him, since he does not remember the incident – he tried to kill his father. He spent the night in jail and the judge released him the next day, putting him on probation and sending him to anger management classes.  He sees a mental health therapist at Clanton Mental Health once a month. (R. 37, 44-45). He can carry only "[a]bout three to five pounds" before his back starts hurting. His wife does all the cooking and takes care of their two children, and his father does the yard work. He can walk no more than two to three minutes. (R. 40). The ALJ also heard testimony from a vocational expert.  (R. 46-49).

On August 26, 2009, the ALJ issued a "step five" decision finding that, although plaintiff cannot perform his past relevant work, he retains the residual functional capacity to perform other jobs existing in significant numbers in the national economy. Thus, he concluded that plaintiff was not disabled within the meaning of the Social Security Act from his alleged onset date of January 15, 2007, through the date of the decision.  (R. 15-30).  On April 23, 2010, the Appeals Council denied plaintiff's request for review. (R. 1-4). Accordingly, the decision of the ALJ stands as the final decision of the Commissioner.

**STANDARD OF REVIEW**

The court's review of the Commissioner's decision is narrowly circumscribed.  The court does not reweigh the evidence or substitute its judgment for that of the Commissioner.  Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings.  Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991).  Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Cornelius, 936 F.2d at 1145.  Factual findings that are supported by substantial evidence must be upheld by the court.  The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied.  Davis, 985 F.2d at 531.  If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed.  Cornelius, 936 F.2d at 1145-46.

**DISCUSSION**

"Occasional" Interference with Concentration, Persistence or Pace

Plaintiff contends that the ALJ erred in his analysis of a limitation included in the RFC assessed by the ALJ – *i.e.*, that plaintiff "has mild to moderate pain, which occasionally interferes with his concentration, persistence or pace." (See R. 23). Plaintiff points out, correctly, that "occasionally" means "up to one-third of an 8-hour working day. He contends that a determination that plaintiff's pain would interfere with his concentration, persistence

7

or pace for up to 2.5 hours of each work day dictates a finding of disability, because "the frequency of his pain would prevent him from 'sustaining focused attention . . . to permit the timely and appropriate completion of tasks.'" (Doc. # 12, pp. 6-7).  Plaintiff argues that the ALJ's hypothetical question to the vocational expert was incomplete, and that this error requires that the ALJ's decision be reversed.

As noted above, the ALJ's RFC assessment includes a limitation of pain that "occasionally" interferes with plaintiff's concentration, persistence or pace.  (R. 23).  In his hypothetical question to the VE, the ALJ included a limitation of "mild to moderate pain that interferes with . . . concentration, persistence and pace[.]" (R. 47-48).  He did not, however, describe the interference as "occasional."  (Id.).  Plaintiff notes that the VE responded to the ALJ's hypothetical question by identifying jobs in the national economy that an individual limited as described in the hypothetical question could perform. (Doc. # 12, p. 7).  He argues, "But as the ALJ failed to indicate how often the hypothetical claimant's concentration, persistence or pace would be [a]ffected, it is unclear how much of an 8-hour working day would be [a]ffected by pain."  (Id.).  While it might have been better for the ALJ to include the term "occasionally" in describing the concentration deficiency to the VE, his failure to do so does not deprive his decision of substantial evidentiary support.  This is so because the ALJ's RFC assessment includes a frequency of interference with concentration, persistence or pace – i.e., "occasional" – which is at the very bottom of the scale used by the Commissioner and the Department of Labor to describe frequency in this context, exceeding only a frequency of no interference whatsoever.  See SSR 96-9p ("'Occasionally' means

occurring from very little up to one- third of the time, and would generally total no more than about 2 hours of an 8-hour workday."); SSR 83-10 (same); see also U.S. Department of Labor, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* (1993), Appendix C (defining "occasionally" to mean that the activity or condition exists "up to 1/3 of the time," "frequently" to mean that the activity or condition exists "from 1/3 to 2/3 of the time" and "constantly" to mean that the activity or condition exists "2/3 or more of the time").  The ALJ's hypothetical limitation of pain "that interferes with his concentration, persistence and pace" necessarily implies a frequency of *at least* "occasional" interference.  In other words, any interference at all – unless it is persistent enough to fall within the higher categories of "frequent" or "constant" – exists "up to 1/3 of the time."  Therefore, the ALJ's failure to use the word "occasionally" does not constitute reversible error. Since the ALJ's hypothetical to the VE was not – as plaintiff argues – "incomplete," the VE's testimony that an individual limited as described can perform other jobs existing in significant numbers in the national economy provides substantial evidentiary support for the ALJ's conclusion that plaintiff's pain-related concentration deficiency does not render him disabled.

## Evidence from First Choice Chiropractor

Plaintiff contends that the ALJ committed reversible error by "fail[ing] to assign any weight to the records from Mr. Neville's treating chiropractor at First Choice Chiropractor." (Doc. # 12, p. 9)(emphasis added).  Plaintiff argues:

> In his decision, the ALJ provided an overview of the medical evidence indicating "Wade Clingan, D.C., a chiropractor, treated the claimant from July 23, 2005 through April 7, 2008 for headache, pain in the lumbar spine, stiffness in the cervical spine, and pain in the hip bilaterally (Exhibit 12 F and

15F)" (Tr. 22).  This was the only mention of Dr. Clingan's treatment notes in the entire record.  The ALJ never discussed the contents of the treatment notes nor did he assign any specific weight to the evidence from Dr. Clingan during his credibility finding.

(Doc. # 12, pp. 9-10)(emphasis added).  Plaintiff argues that the ALJ's credibility finding is flawed because he failed "to discuss or assign specific weight to Dr. Clingan's evaluations and findings." (Id.).  A chiropractor is not an "acceptable medical source" under the Commissioner's regulations and, accordingly, his opinion cannot establish the existence of an impairment.  Crawford v. Commissioner of Social Security, 363 F.3d 1155, 1160 (11th Cir. 2004); 20 C.F.R. §§ 404.1513(a), 416.913(a).  However, evidence from a chiropractor may be used to show the severity of a claimant's impairments and how it affects the claimant's ability to work.  See 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1).  The ALJ concluded – based on acceptable medical source opinion – that plaintiff has a severe impairment of "myofascial low back pain versus mild degenerative disc disease of the lumbar spine."  (R. 17).  He further concluded that plaintiff experiences "mild to moderate pain[.]" (R. 23).

"'[T]he severity of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality.'"  Russell v. Astrue, 331 Fed. Appx. 678 (11th Cir. 2009)(quoting McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir.1986)).  Dr. Clingan's treatment notes are cursory.  (See Exhibits 12F, 15F).[8]  He offers no opinion regarding

---

[8]  The treatment records from Dr. Clingan are included in Exhibits 12 F and 15F.  Exhibit 12F includes nothing that is not also included in Exhibit 15F.  Exhibit 15F further includes a billing/payment

plaintiff's ability or inability to perform any work-related functions.[9]

Social Security Rule 06-03p sets forth the Commissioner's policy regarding evaluation of opinions and other evidence from medical sources, like Dr. Clingan, who are not "acceptable medical sources" as defined in the Commissioner's regulations.  It states that the ALJ "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions

---

summary. (R. 364-65). The Commissioner has placed the pages of Exhibit 15F out of order in the administrative transcript. However, the notes may be read, in order of treatment, by following the page numbering printed on each page of the record by Dr. Clingan's medical records program.  Dr. Clingan's note for Saturday, July 23, 2005, includes nothing other than diagnoses, and does not indicate that he evaluated plaintiff on that date or performed any service. (See R. 358 (diagnoses), R. 364 (describing transaction for that date only as "CPT Code used for Dx Link" – as opposed to "office visit," or "chiropractic manipulation" described on other dates of service – and "Code" for that date as "CPTDXLINK" rather than a numerical code for treatment); see also Exhibit 12F (plaintiff's treatment records printed at 8:55 a.m. on December 10, 2008, but including no record of treatment for July 2005)).  The record reflects that Dr. Clingan saw plaintiff seven times between June 2006 and July 2007; after a break of over eight months, he saw plaintiff again on April 7, 2008.  For office visits in June 2006, October 2006 and February 2007, Dr. Clingan's notes include – in addition to his diagnoses (unaccompanied by objective testing results or any explanation) – a list of plaintiff's chief complaints (headache, back pain, neck pain, and bilateral hip pain), and a list of the manipulations and adjustments performed by Dr. Clingan.  The December 20, 2006, treatment note in Exhibit 15F – but, oddly, not the treatment note in Exhibit 12F for the very same date – includes the foregoing and adds a heading of "Assessment," under which Dr. Clingan assesses plaintiff's prognosis as "good" and his improvement as "moderate." (See R. 363).  Dr. Clingan included results of physical examination on only three occasions:  March 8, 2007; July 24, 2007; and April 7, 2008.  In the notes for these three visits, the examination results are identical:

- Decreased range of motion in: the cervical spine and the thoracic spine.
- Palpated misalignment in: the lumbar spine and the cervical spine.
- Muscle tightness in: the trapezius muscle and the muscles of the lumbar spine.

(R. 359, 360, 361).  For a visit on June 18, 2007, Dr. Clingan's note includes only diagnoses.  (R. 359-60).

[9]  While Dr. Clingan noted – on the three occasions described above (supra n. 8) – decreased range of motion, palpated misalignment, and muscle tightness in plaintiff's spine, as well a tightness in plaintiff's trapezius muscles, he expressed no opinion translating his findings into work-related functional limitations.

11

may have an effect on the outcome of the case."  SSR 06-03p.  Notably, plaintiff does not point to any particular findings or conclusions in Dr. Clingan's records and explain how, in plaintiff's opinion, those findings or conclusions contradict the ALJ's assessment of plaintiff's credibility or residual functional capacity.  Upon careful review of Dr. Clingan's notes, the court finds nothing in them to impeach the ALJ's findings. To the extent that Dr. Clingan expressed any opinion at all aside from his diagnoses, it was not an opinion that "may have an effect on the outcome of the case."  Accordingly, the ALJ did not err by failing to state explicitly the weight he assigned to Dr. Clingan's opinion.[10]

### Opinion of Mental Health Therapist Rhodes

Exhibit 16F is a form signed by "Lisa Rhodes, MSW, LCSW" an outpatient therapist at Chilton Shelby Mental Health Clinic, rating plaintiff's degree of limitation as "marked" or "extreme" in fifteen of eighteen listed mental work-related functions. (R. 366-67). The ALJ considered Rhodes' opinion but declined to credit it, stating, "I reject this opinion as it is by an outpatient therapist, and not a psychologist or a psychiatrist.  Furthermore, there are no treatment notes to support these findings and the other medical records in this file do not support such an assessment." (R. 28). Plaintiff argues that, even though Rhodes is "not technically deemed [an] 'acceptable medical source,'" the ALJ had a duty to evaluate her opinion as to the severity and functional effects of plaintiff's impairments. (Doc. # 12, pp. 12-13)(citing SSR 06-03p). Plaintiff further maintains that the ALJ's "statement that no

---

[10]  Plaintiff complains that the ALJ "failed to assign any weight to the records from [Dr. Clingan]" and that he "did not assign any specific weight to the evidence from Dr. Clingan." (Doc. # 12, pp. 9-10).  The requirement to "assign weight" pertains to opinions, not to "records" or "evidence."

treatment notes or medical records support [Rhodes'] assessment ... is obviously contrary to the record which is replete with evidence of [plaintiff's] severe mental impairments." (Doc. # 12, p. 13). As evidence, plaintiff first points to the April 2007 diagnosis of schizoaffective disorder, bipolar type, and borderline intellectual functioning by Dr. Brantley, the consultative psychologist,[11] and the diagnosis of "Major Depressive D/O severe [with] Psychotic features" made by Lynn Hall – who is, like Rhodes, a mental health therapist and also not an "acceptable medical source" – on March 16, 2007.  In her intake assessment, Hall noted that plaintiff denied any current psychosis or paranoia but had "been [diagnosed with] Psychosis in past [at] Greil." (R. 297). The psychiatrist at Greil diagnosed "Major Depressive Disorder with Psychosis (Psychosis resolved)[.]" (R. 229).  Consistent with the assessments of the acceptable medical sources, the ALJ concluded that plaintiff suffers from "severe" mental impairments of "borderline intellectual functioning," "bipolar type, schizoaffective disorder[,]" and "major depressive/affective disorder[.]" (R. 17).

Plaintiff further argues that he "received treatment from Montgomery Area Mental Health Authority from March 2007 until May 2007," but he identifies nothing within the MAHMA record which suggests the marked and extreme limitations noted by Rhodes. (Doc.

_____

[11]  Plaintiff quotes Dr. Brantley's diagnosis as "'schizoaffective disorder, bipolar type with mild manic features, partially controlled on medication and borderline intellectual functioning.'"  (Doc. # 12, pp. 13-14)(quoting R. 254).  Plaintiff omits a critical phrase from Dr. Brantley's diagnosis.  Dr. Brantley's actual diagnoses were borderline intellectual functioning and "Schizoaffective Disorder, Bipolar Type (295.70), With Mild Manic Features, *With No Psychotic Features*, Partially Controlled on Medication[.]" (R. 254)(emphasis added).

# 12, p. 14).[12]  Finally, plaintiff relies heavily on treatment notes from Chilton-Shelby Mental

Health, which he claims to have "submitted" after the hearing and well before the ALJ issued

his decision.  (Doc. # 12, pp. 9, 14).  Plaintiff argues:

> [T]he [administrative law] judge failed to consider or assign any weight to the
> records from Mr. Neville's treating mental health facility, Chilton-Shelby
> Mental Health.  The ALJ failed to even mention these records in his
> decision despite having knowledge of said records. In fact, during Mr. Neville's
> hearing, the ALJ specifically requested records from Mr. Neville's treating
> therapist at Chilton Mental Health stating "... I would be interested if she
> happened to do some testing [and] ... I would like to see her office notes if you
> can supply that" (Tr. 46).During the closing of the hearing, the ALJ
> specifically stated "we'll wait on those records from the Mental Health folks
> ..." (Tr. 49). On June 5, 2009, records were submitted from Shelby Mental
> Health through the Social Security's Electronic Records Express and a
> confirmation was obtained (See Attached).  The ALJ's decision, dated August
> 26, 2009, failed to reference any of these records.

(Doc. # 12, p. 9).  Later in his brief, plaintiff quotes extensively from those records  – citing

pages 11 through 19 of "attached" – and argues that "[t]hese records document the

persistence and intensity of Mr. Neville's mental impairments." (Id., p. 14).

---

[12] Plaintiff argues that he "received treatment from Montgomery Mental Health Authority from March 2007 until May 2007." (Doc. # 12, p. 14)(citing R. 293). The ALJ discussed plaintiff's intake assessment on March 16, 2007, and further stated, "On May 15, 2007, it was noted that the claimant was prescribed and taking Seroquel, Lexapro, and Straterra[.]" (R. 21)(citing Exhibit 10F). However, Exhibit 10F, which includes the page cited by plaintiff, consists entirely of plaintiff's intake assessment at MAHMA. The first page of the form, which was completed by hand by therapist Hall, has dates written in three places. The handwritten date at the top of the first page of the "Initial Contact/Client Profile - 1" form at Exhibit 10F – which is written in a space provided on the form for "Date of Current Admission" – might be read as either "03/15/07" or "05/15/07," and the ALJ both read it as the latter. However, it is evident that Hall corrected her handwritten notation of the date in the middle of that same page – where she annotated the date of the "Intake Appointment" – from "3/15/07" to "3/16/07" by writing over the incorrect date (which is still visible beneath the correction), and that she similarly corrected the date she wrote beside her signature at the bottom of that page. (R. 293). There are six handwritten annotations of the date on the following pages of the form, all reflecting a date of March 16, 2007 (R. 294-98), including a section listing plaintiff's "Non-Center Prescribed Medications" as Seroquel, Lexapro and Stratera prescribed by "Griel doctor." (R. 298). To the extent plaintiff's argument rests on continuing treatment at MAHMA over a period of two months, it is not supported by the record.

Plaintiff's counsel's selective omission of critical parts of the transcript borders on misrepresentation. At the hearing, plaintiff testified that he saw a therapist at "Clinton Mental Health" monthly. (R. 37). Later in the hearing, the ALJ indicated that he did not have records of that mental health treatment and – as plaintiff points out – the ALJ requested that plaintiff's counsel provide office notes from the therapist. (R. 46). At the conclusion of the hearing, the following exchange occurred:

> ALJ: Okay. Well, Mr. Neville, we'll wait on those records from the Mental Health folks and the other information that you all –
>
> ATTY: Your Honor, *can we request 30 days*?
>
> ALJ: *Okay.  That will work.*
>
> ATTY: Thank you, Your Honor.

(R. 49)(emphasis added).[13]  The hearing was held on April 17, 2009.  (R. 31-50).  By letter dated May 12, 2009 – five days before the record closed – plaintiff's attorney forwarded the mental limitations rating form completed by Rhodes to the ALJ. The cover letter stated:

> Enclosed, please find the additional medical record information from **Chilton Shelby Mental Health** that you requested for Mr. Neville's case during his hearing last 04/17/2009. Thank you very much for your consideration of this information and Mr. Neville's disability claim.
>
> If there is anything else that needs to be done, please let me know.

(Exhibit 16F, R. 366)(bold type in original).[14]  Thus, the administrative transcript

---

[13] The attorney who appeared for plaintiff at the hearing before the ALJ was from the same law firm as the attorney who is counsel of record in this action. (See R. 31, 366; Doc. # 12).

[14] Exhibit 16F includes only the rating form completed by Rhodes on April 24, 2009, one week after the administrative hearing.  (R. 366-69). It does not include the therapist's "office notes" requested by the

demonstrates that the ALJ held the record open for a period of thirty days following the hearing and, further, that plaintiff's counsel provided Exhibit 16F to the ALJ within that period of time with a cover letter indicating that the attached exhibit was the information requested by the ALJ.  Plaintiff's attorney did not then ask the ALJ to hold the record open for any additional period of time and nothing in his letter suggests that additional records were forthcoming.  Thus, even assuming that the records "were submitted" on June 5, 2009 – as plaintiff's counsel represents – they were submitted too late, as the record had closed.[15] The record before the ALJ included no treatment records whatsoever from Chilton Shelby Mental Health. Accordingly, plaintiff's contention that the ALJ erred by failing to discuss and/or assign weight to those records is without merit.

Plaintiff does not argue that he thereafter provided those records to the Appeals Council, and there is no indication in the record that he did so. (See R. 4, 210-13). Additionally, as noted above, plaintiff attached no exhibits to the brief he filed in this court. (See docket entry for Doc. # 12). Thus, the treatment notes on which plaintiff now relies have not been made a part of this court's record, as an attachment to plaintiff's brief or otherwise.[16] Contrary to plaintiff's argument, the ALJ did not err in evaluating Rhodes'

---

ALJ at the hearing, and plaintiff does not contend that those notes were forwarded to the ALJ on May 12, 2009 with the rating form.

[15] Plaintiff cites an attached confirmation; however, the brief that plaintiff filed in this court includes no attachments.

[16] The court declines to exercise its discretion to allow plaintiff an opportunity to supplement his brief to include the referenced attachment because, as noted above, he did not submit the treatment notes to the ALJ before the record closed and did not submit it to the Appeals Council at any time. Accordingly, the notes are not a part of the administrative transcript and cannot form the basis for sentence four reversal of

opinion as expressed in Exhibit 16F.

## CONCLUSION

Upon review of the administrative record before the court, the court concludes that the decision of the Commissioner is supported by substantial evidence and proper application of the law and that it is, accordingly, due to be affirmed.

DONE, this 19th day of July, 2011.


/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

---

the Commissioner's decision.  Additionally, it is evident that plaintiff could not demonstrate good cause for his failure to submit the treatment records during administrative processing of his case, as would be required for a "new evidence" remand pursuant to sentence six of 42 U.S.C. § 405(g).  Plaintiff does not argue that he is entitled to a sentence six remand.

17